1
2
3
4
5
6

ADINA T. STERN (SBN 110396)
ADINA T. STERN, A PROFESSIONAL CORPORATION
30021 Tomas Street, Suite 300
Rancho Santa Margarita, CA  92688
Telephone:  (949) 459-2111
Email:  astern@sternlawoffices.com

**JS-6**

Attorney for Plaintiff/Counter-Defendant
JEFFREY J. GOGUL

7
8
9
10
11
12
13
14
15

CHRISTOPHER P. NORTON (SBN 234621)
DAVID A. CARNIE (SBN 320709)
MICHAEL COHEN (SBN 346737)
SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.
1901 Avenue of the Stars, Suite 200
Los Angeles, CA 90067
Telephone: (424) 431-1990
Direct Dial: (424) 431-4432
Email:  cnorton@smsm.com
          dcarnie@smsm.com
          mcohen@smsm.com

Attorneys for Defendant/Counter-Claimant
DENYA FANELLI individually and doing
business as CALI COAST EQUESTRIAN

16

UNITED STATES DISTRICT COURT

17

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

18
19
20
21
22
23
24

| | |
|---|---|
| JEFFREY J. GOGUL,<br><br>          Plaintiff,<br><br>     vs.<br><br>DENYA FANELLI individually<br>and doing business as CALI<br>COAST EQUESTRIAN,<br><br>          Defendant. | Case No. 2:23-cv-10690-HDV-RAO<br>(Assigned to Honorable Hernán D. Vera<br>and Magistrate Judge, Honorable<br>Rozella A. Oliver)<br><br>**CONSENT DECREE** |

25
26
27
28

| | |
|---|---|
| DENYA FANELLI individually<br>and doing business as CALI<br>COAST EQUESTRIAN,<br><br>          Counter-Claimant,<br><br>     v. | Complaint filed:  December 20, 2023<br>Trial Date:          May 6, 2025 |

JEFFREY J. GOGUL,

      Counter-Defendant.

The parties desire to avoid further litigation and have reached agreement, which is memorialized in **Exhibit 1** of this Consent Decree. Neither Defendant nor Counter-Defendant admits any liability or wrongdoing on their part and this Consent Decree shall not constitute any admission on their part of any liability or wrongdoing here. Certain portions of the agreement between the parties require further action and accordingly, they wish that the court retain jurisdiction over this matter for the purposes of enforcing certain portions of the agreement by and between the parties: Accordingly,

It is ORDERED, ADJUDGED, AND DECREED as follows:

1. Defendant and Counter-Claimant, Denya Fanelli ("Fanelli"), shall immediately notify the United States Equestrian Federation that Plaintiff and Counter-Defendant, Jeffrey J. Gogul, ("Gogul") is a co-owner of that that Grey, Warmblood gelding by Cardento, out of Vanita, foaled in 2010 known as and registered with the United States Equestrian Federation ("USEF") as "The Funk Zone" (Horse No. 5723566) (the "Horse"). Accordingly, Ms. Fanelli is ordered to complete the USEF Ownership Transfer Form online adding as a co-owner Mr. Gogul as he is known by USEF: Jeff Gogul, USEF Member No. 118106. Ms. Fanelli shall be responsible for paying the fee for such a transfer. This task must be performed by Ms. Fanelli as the parties have been informed by USEF, that it does not provide for any other method of adding a co-owner.

2. Once the transfer is complete, Ms. Fanelli shall provide Mr. Gogul, through counsel, with a copy of all email confirmation from USEF of the transfer request and all email certificates she receives.

3.  The parties are ordered to execute the Co-Ownership Agreement attached to the Settlement as its Exhibit 2.

4.  Ms. Fanelli agrees that by no later than December 30, 2024, she shall notify Lori Puthoff, Carol Wilner, and Julie Winkle with a letter in the form attached to the Settlement as Exhibit 3 advising these individuals to provide Mr. Gogul with all veterinary records of the Horse, and the names of all veterinarians who have treated the Horse while in their possession.

5.  Within 24 hours after sending such letter, Ms. Fanelli shall provide Mr. Gogul, through counsel, with evidence that the letters were sent.

6.  This court shall retain jurisdiction over this matter for the purpose of enforcement of the agreement by and between the parties.

Dated: _____January 7_____, 2025          UNITED STATES DISTRICT COURT

_____
Honorable Hernán D. Vera
Judge

Approved:

_Adina T. Stern_
_____
ADINA T. STERN,
A PROFESSIONAL LAW CORPORATION
Adina T Stern
Attorneys for Plaintiff/Counter-Defendant
JEFFREY J. GOGUL

Jeffrey J. Gogul (Dec 30, 2024 16:42 EST)
_____
JEFFREY J. GOGUL

///

1  Approved:

2

3
                                              */s/ David A. Carnie*
4                                        SEGAL McCAMBRIDGE
                                         SINGER & MAHONEY, LTD.
5                                        Christopher P. Norton
                                         David A. Carnie
6                                        Michael Cohen
                                         Attorney for Defendant/Counter-Claimant,
7                                        DENYA FANELLI

8

9

10                                       DENYA FANELLI

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

Approved:

3

4

5

6

7

SEGAL McCAMBRIDGE
SINGER & MAHONEY, LTD.
Christopher P. Norton
David A. Carnie
Michael Cohen
Attorney for Defendant/Counter-Claimant,
DENYA FANELLI

8

9

10

DENYA FANELLI

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1 TO CONSENT DECREE

# MUTUAL GENERAL RELEASE AND SETTLEMENT AGREEMENT

This Settlement Agreement and Release ("**Agreement**") is made and entered into as of the 23 day of December 2024 ("**Effective Date**") by and between Jeffrey Gogul ("Gogul"), on the one hand, and Denya Fanelli ("**Fanelli**"), on the other hand. For purposes of this Agreement, Gogul, and Fanelli are collectively referred to herein as the "**Parties**" and/or individually as a "**Party**".

## RECITALS

A.  **WHEREAS** Gogul filed an action in the United States District Court, Central District of California, Western Division on December 20, 2023, entitled *Gogul v. Fanelli*, Case No. 2:23-cv-10690-HDV-RAO (the "**Action**") based on Gogul's claims regarding the rights and duties of Gogul and Fanelli with respect to their interests in that Grey, Warmblood gelding by Cardento, out of Vanita, foaled in 2010 known as and registered with the United States Equestrian Federation ("**USEF**") as "The Funk Zone" (Horse No. 5723566) (the "**Horse**");

B.  **WHEREAS** Fanelli filed a counterclaim against Gogul relating to the Horse;

C.  **WHEREAS** the Horse was leased to Lori Puthoff ("**Puthoff**") during the calendar year 2023 (the "**2023 Lease**") and all payments for that lease were held by Fanelli. The Horse was also leased to Puthoff pursuant to a renewal of the 2023 Lease (the "**2024 Renewal Lease**"). The 2024 Renewal Lease will expire on December 31, 2024.

D.  **WHEREAS** the Parties acknowledge and agree that Gogul and Fanelli are both joint owners of the Horse; and

E.  **WHEREAS** the Parties hereto agree that it is in their mutual interests to enter into this Agreement that will govern their understanding moving forward as to their respective rights and duties regarding the Horse.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, mutual covenants contained in this Agreement and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

The Parties agree to the following terms and conditions as of the Effective Date.

1.      **Enforcement of this Agreement**. The following provisions of this Agreement shall be incorporated into a consent decree in the form attached hereto as **Exhibit 1** (the "**Consent Decree**"): Paragraphs 2, 4, 6, and 3 (to the extent it requires execution of the Co-Ownership Agreement as defined in Paragraph 3). The Parties agree that the Court shall retain jurisdiction to enforce this provision of this Agreement. Once all of the conditions of the Consent Decree are satisfied, the Parties shall each file a Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c) dismissing their respective claims against each other in the Action with prejudice. In the event the court fails to approve the Consent Decree, this Agreement shall be binding on the Parties from the date of execution of this Agreement until terminated and the above-

JG

Initials      Initials

1

referenced dismissal shall not be entered until the requirements of Sections 2 are satisfied, or until terminated.

2.    **USEF Registration**. Concurrent with execution of this Agreement, Fanelli shall complete the USEF Ownership Transfer Form online adding Jeff Gogul, USEF Member No. 118106 as owner of the Horse and shall pay the fee for such transfer. Fanelli shall provide Gogul, through counsel with a copy of all email confirmations from USEF and email certificate.

3.    **Joint Ownership**. The Parties hereby acknowledge that Gogul and Fanelli are both joint legal owners of the Horse and their joint ownership shall be governed by the Equine Co-Ownership Agreement attached hereto as **Exhibit 2** (the "**Co-Ownership Agreement**") which shall be signed by the Parties concurrently herewith.

4.    **Payment of Stipulated Sum.** The Parties agree that Fanelli owes Gogul the sum of Fifty-Five Thousand Dollars ($55,000.00) (the "**Stipulated Sum**") for profits held by Fanelli arising from the joint ownership of the Horse.

    a.    The Parties agree that Gogul shall be paid the Stipulated Sum from Lease proceeds from the Horse as follows:

        i.    If the Horse is leased for use at any time during the period commencing January 1, 2025, and ending November 30, 2025, Gogul shall be paid the greater of the following: (i) Eighty percent (80%) of the lease fee; (ii) Eighty-Eight Thousand Dollars ($88,000.00); or (iii) the full lease amount (total payment to Gogul shall not to exceed $33,000 in addition to or above 50 percent of the lease in the event the 2025 lease is greater than the 2024 lease). The difference between (50%) of such lease fee and the amount received by Gogul will go towards repayment of the Stipulated Sum. (*By way of example, if the Horse should lease for the sum of $110,000, Gogul shall receive $88,000.00 and the Stipulated Sum will be reduced by $33,000. If the Horse should lease for $100,000, Gogul shall receive $88,000.00 and the Stipulated Sum will be reduced by $33,000. If the Horse should lease for $80,000, Gogul shall receive $80,000 with the Stipulated Sum reduced by $40,000.*)

        ii.    If the Horse is leased between December 1, 2025, and November 30, 2026, Gogul shall be paid 50% of the lease fee plus the remaining amount due from the Stipulated Sum. (*By way of example, if the remaining balance of the Stipulated Sum is $22,000 and the Horse should lease for the sum of $110,000, Gogul shall receive $77,000.00 and the Stipulated Sum would be paid in full. If the remaining balance of the Stipulated Sum is $22,000 and the Horse should lease for $100,000, Gogul shall receive $77,000.00 and the Stipulated Sum would be paid in full. If the Horse should lease for $80,000 and the remaining balance of the Stipulated Sum is $22,000, Gogul shall receive $62,000 and the Stipulated Sum would be paid in full.*) If the lease fee is not

JG

Initials    Initials

2

sufficient to pay down the Stipulated Sum, the balance will carry over to the next transaction that generates income from the horse.

b. If the Horse should be sold, Gogul shall receive fifty percent (50%) of the sales price plus an amount equal to the balance remaining of the Stipulated Sum. Fanelli shall receive the remaining amount of the sales price.

c. If there is a casualty event, as defined in the applicable insurance policy for the Horse, that triggers payment under the insurance policy, Gogul shall receive fifty percent (50%) of the insurance proceeds plus an amount equal to the balance remaining of the Stipulated Sum. Fanelli shall receive the remaining amount of the insurance proceeds.

d. Any such payments to Gogul shall be paid as directed by Gogul or his counsel at the time of the transaction.  Any such payments to Fanelli shall be paid as directed by Fanelli or her counsel at the time of the transaction.

e. Nothing contained herein shall prevent Fanelli from prepaying the amount due on the Stipulated Sum. In the event the Horse cannot generate sufficient revenue to pay the Stipulated Sum by November 30, 2027, the balance due of the Stipulated Sum shall become due and payable as a judgment pursuant to the consent decree.

5.     **Consent of the Parties to Lease or Sale**. The Parties agree that the Horse shall not be sold, leased or otherwise hypothecated in any way without the consent both Fanelli and Gogul's consent to the price and terms of such transaction. The Parties agree that any lease shall contain the following terms: (a) Lessee shall reimburse lessors for medical and mortality insurance premiums and shall comply with all terms of the policy including any conditions precedent; (b) Reasonable approval of all boarding stables and trainer utilized by lessee; (c) Reasonable limits on height jumped by horses in shows and during practice. Reasonable limits on frequency of shows; (d) A waiver of liability; (e) Indemnification from third party claims and if Horse will be used by a minor, indemnification by parents or legal guardians; (f) Annual leases shall end on November 30th of the applicable year; and (g) Lessee shall be fully responsible for all care and maintenance of Horse.

6.     **Instructions to Third Parties**. Fanelli agrees that concurrently with execution of this Agreement, her counsel shall send, via certified mail and via email letters to Lori Puthoff, Carol Wilner, and Julie Winkle letters on counsel's letterhead advising them of this Agreement, of Gogul's co-ownership of the Horse and instructing them to provide Gogul with all veterinary records of the Horse, and the names of all veterinarians who have treated the Horse while in their possession. A copy of each such letter and proof of mailing shall be forwarded to counsel for Gogul within 24 hours after the letters are sent. The form of such letter is attached hereto as **Exhibit 3**.

7.     **Right of First Refusal**. The Parties further agree that any sale shall be subject to a right of first refusal described in the Co-Ownership Agreement.

_JG_

_____    _____
Initials      Initials

3

8. **Release of Claims.** Except for a breach or violation of the obligations created by this Agreement and the Co-Ownership Agreement and the Consent Decree, the Parties, with full understanding of the contents and legal effect of this Agreement, and mutual releases contained herein, promise to and do hereby completely release and forever discharge each other, as well as each Party's affiliates, predecessors, successors, assigns, partners, joint venturers, administrators, executives, owners, employees, shareholders, officers, directors, insurer, accountants, fiduciaries, representatives, family members, heirs, attorneys, and all other persons or entities claiming through them or on their behalf, from any and all claims of any and every kind, nature, and character, known or unknown, past, present, and future, arising from the Action.

9. **California Civil Code Section 1542 Waiver.** Except as otherwise set forth in this Agreement, the Parties and each of them do hereby assume the above-mentioned risks and agree that this Agreement shall apply to all unknown or unanticipated results of the transactions and occurrences described above, as well as those known and anticipated, and upon advice of counsel, each party does hereby knowingly waive any and all rights and protections under Section 1542 of the California Civil Code which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Parties to this Agreement understand and expressly acknowledge the significance of Section 1542, and this Agreement shall act as a release of future claims against the Parties hereto, except where otherwise indicated in this Agreement and the provisions of Section 1542 are hereby waived.

10. **Assignment.** Each Party represents and warrants that they have full authority to enter into this Agreement and no portion of any claim, right, demand, or cause of action that said Party may now or hereafter have against another Party, arising from this Agreement has been assigned, granted, or transferred by that Party, whether voluntarily or involuntarily, to any other person, firm, or entity.

11. **Venue and Jurisdiction.** This Agreement shall be deemed to have been mutually negotiated, prepared, and entered into in California and shall be governed, construed and interpreted in accordance with the laws of the State of California. Enforcement of the Consent Decree shall be determined by the Court in the Action. In the event of any dispute, claim or controversy arising out of or relating to this Agreement that is outside the scope of the Consent Decree relating to or arising out of the breach, termination, enforcement, interpretation, construction, or validity thereof, the Parties hereby consent to binding arbitration as set forth in the Co-Ownership Agreement.



JG

Initials          Initials

12.     **Representation by Counsel.** The Parties have had the opportunity to have this Agreement and any related documents, reviewed by an attorney of their choice. Accordingly, the language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties.

13.     **No Admission of Fault**. Except as expressly provided herein, each Party understands and agrees that this Agreement and the settlement provided herein are intended to compromise the Action, to avoid litigation and to buy peace, and that this Agreement and the settlement provided for herein shall not be construed or viewed as an admission by any of the Parties of liability or wrongdoing, such liability being expressly denied.  This Agreement, and the settlement provided for herein shall not be admissible in any lawsuit, administrative claim or any judicial, administrative or arbitration proceeding if offered to show, demonstrate, evidence, or support a contention that any of the Parties acted illegally, improperly, or in breach of law, contract, or proper conduct.

14.     **Authority of Signing Individual or Party**. The Parties warrant, represent, and agree that each has the authority, capacity and is legally competent to enter into this Agreement and has the authority to bind each Party to the representations, terms, conditions, and covenants set forth herein.  This Agreement shall be binding and is binding upon the Parties, their respective heirs, successors, assigns, parent and subsidiary companies, agents, attorneys, and representatives.

15.     **Attorneys' Fees**. In the event any action is brought to enforce any provision of this Agreement, the prevailing party shall be entitled, in addition to all other  remedies, to collect its costs and expenses including reasonable attorneys' fees as part of its judgment.

16.     **Severability**. If any provision of this Agreement is for any reason held to be invalid or unenforceable under applicable laws, such invalidity shall not affect any of the provisions of this Agreement that can be given effect without the invalid provisions, and to this end, the provisions hereof are severable unless such invalidity would defeat the entire business purpose of this Agreement.

17.     **Voluntary Agreement**. The Parties, and each of them, hereby certify that this Agreement is being freely and voluntarily signed by each of them after each has: (i) read this Agreement; (ii) been apprised by their attorney of all relevant information and the consequences of signing this Agreement; and (iii) made their own respective investigation of the facts related to this Agreement.  The Parties, and each of them, are relying solely on their own judgment, belief, and knowledge with regard to the subject of this Agreement, and they acknowledge that they have not been influenced to any extent whatsoever in making this Agreement by any representations, inducements, promises or other statements by any other party to this Agreement, or anyone else, which are not set forth herein.

18.     **Entire Agreement**. This Agreement along with all exhibits constitute the entire Agreement between the Parties on the subject matter involved herein. There are no oral agreements, which modify, vary, or contradict any provision of this Agreement, and there are no representations (oral or otherwise) which any party has relied on in agreeing to this Agreement



_____    _____
Initials      Initials

other than those expressly contained herein. This Agreement will not be modified or amended in any manner except upon a written agreement signed by each of the Parties.

19.    **Further Cooperation**. The Parties agree to cooperate in the preparation and execution of any and all documents that are reasonably necessary to carry out the purpose and intent of this Agreement. Neither Party shall unreasonably withhold, condition, or delay its compliance with any reasonable request made pursuant to this Agreement.

20.    **Counterparts**. This Agreement may be executed in counterparts.  The signed counterparts shall collectively be considered a single document.  A true and correct copy or facsimile of this Agreement shall be equally binding as an original signature.

21.    **Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the Parties and their respective heirs, successors, and assigns.

22.    **Waiver and Consent**.  Any waiver of, or consent to depart from, the requirements of any provision of this Agreement shall be effective only if it is in writing and signed by the Party giving such waiver, and only in the specific instance and for the specific purpose for which it has been given. No waiver of any of the provisions of this Agreement shall constitute a continuing waiver or a waiver of any other provision (whether or not similar). No failure on the part of any Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of such right. No single or partial excuse of any such right shall preclude any other or further exercise of such right or exercise of any other right.

23.    **Notices**.  All notices and other communications which are required to be, or which may be given under this Agreement shall be in writing and shall be delivered at the addresses set out hereinbelow.  Notice may be given by personal delivery, recognized overnight courier, by United States certified mail.  Notice shall be deemed to have been duly given (a) if by personal delivery, on the first to occur of the date of actual receipt or refusal of delivery by any person at the intended address, (b) if by overnight courier, on the first (2nd) Business Day after being delivered to a recognized overnight courier,  or (c) if by certified mail, on the fifth (5th) Business Day after being deposited in the United States mail, certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Gogul:

        Adina T. Stern, Esq.
        Adina T. Stern, A Professional Law Corporation
        30021 Tomas Street, Suite 300
        Rancho Santa Margarita, California 92688
        Email: astern@sternlawoffices.com
        Phone: (949) 459-2111

_____    _____
Initials    Initials

6

If to FANELLI:

Christopher Norton, Esq.
1901 Avenue of the Stars, Suite 200
Los Angeles, CA 90067
Telephone:  (424) 431-1990
Direct Dial: (424) 431-4432
Email:  cnorton@smsm.com

24.    **Time of the Essence**.  The Parties agree that time is of the essence throughout the term of this Agreement and any extension or renewal thereof, and of every provision hereof in which time is an element.  No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

25.    **Section Headings**.  The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals as of the day and year first set forth above.

Date: _Dec 24, 2024_____

Jeff J Gogul (Dec 24, 2024 16:46 EST)
_____
Jeffrey Gogul

Date: _____

_____
Denya Fanelli

JG
_____    _____
Initials    Initials                        7

## MUTUAL GENERAL RELEASE AND SETTLEMENT AGREEMENT

This Settlement Agreement and Release ("**Agreement**") is made and entered into as of the 23 day of December 2024 ("**Effective Date**") by and between Jeffrey Gogul ("Gogul"), on the one hand, and Denya Fanelli ("**Fanelli**"), on the other hand. For purposes of this Agreement, Gogul, and Fanelli are collectively referred to herein as the "**Parties**" and/or individually as a "**Party**".

### RECITALS

A. **WHEREAS** Gogul filed an action in the United States District Court, Central District of California, Western Division on December 20, 2023, entitled *Gogul v. Fanelli*, Case No. 2:23-cv-10690-HDV-RAO (the "**Action**") based on Gogul's claims regarding the rights and duties of Gogul and Fanelli with respect to their interests in that Grey, Warmblood gelding by Cardento, out of Vanita, foaled in 2010 known as and registered with the United States Equestrian Federation ("**USEF**") as "The Funk Zone" (Horse No. 5723566) (the "**Horse**");

B. **WHEREAS** Fanelli filed a counterclaim against Gogul relating to the Horse;

C. **WHEREAS** the Horse was leased to Lori Puthoff ("**Puthoff**") during the calendar year 2023 (the "**2023 Lease**") and all payments for that lease were held by Fanelli. The Horse was also leased to Puthoff pursuant to a renewal of the 2023 Lease (the "**2024 Renewal Lease**"). The 2024 Renewal Lease will expire on December 31, 2024.

D. **WHEREAS** the Parties acknowledge and agree that Gogul and Fanelli are both joint owners of the Horse; and

E. **WHEREAS** the Parties hereto agree that it is in their mutual interests to enter into this Agreement that will govern their understanding moving forward as to their respective rights and duties regarding the Horse.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, mutual covenants contained in this Agreement and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### AGREEMENT

The Parties agree to the following terms and conditions as of the Effective Date.

1.     **Enforcement of this Agreement**. The following provisions of this Agreement shall be incorporated into a consent decree in the form attached hereto as **Exhibit 1** (the "**Consent Decree**"): Paragraphs 2, 4, 6, and 3 (to the extent it requires execution of the Co-Ownership Agreement as defined in Paragraph 3). The Parties agree that the Court shall retain jurisdiction to enforce this provision of this Agreement. Once all of the conditions of the Consent Decree are satisfied, the Parties shall each file a Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c) dismissing their respective claims against each other in the Action with prejudice. In the event the court fails to approve the Consent Decree, this Agreement shall be binding on the Parties from the date of execution of this Agreement until terminated and the above-



Initial     Initials                                                    1

referenced dismissal shall not be entered until the requirements of Sections 2 are satisfied, or until terminated.

2.      **USEF Registration**. Concurrent with execution of this Agreement, Fanelli shall complete the USEF Ownership Transfer Form online adding Jeff Gogul, USEF Member No. 118106 as owner of the Horse and shall pay the fee for such transfer. Fanelli shall provide Gogul, through counsel with a copy of all email confirmations from USEF and email certificate.

3.      **Joint Ownership**. The Parties hereby acknowledge that Gogul and Fanelli are both joint legal owners of the Horse and their joint ownership shall be governed by the Equine Co-Ownership Agreement attached hereto as **Exhibit 2** (the "**Co-Ownership Agreement**") which shall be signed by the Parties concurrently herewith.

4.      **Payment of Stipulated Sum.** The Parties agree that Fanelli owes Gogul the sum of Fifty-Five Thousand Dollars ($55,000.00) (the "**Stipulated Sum**") for profits held by Fanelli arising from the joint ownership of the Horse.

a.   The Parties agree that Gogul shall be paid the Stipulated Sum from Lease proceeds from the Horse as follows:

i.   If the Horse is leased for use at any time during the period commencing January 1, 2025, and ending November 30, 2025, Gogul shall be paid the greater of the following: (i) Eighty percent (80%) of the lease fee; (ii) Eighty-Eight Thousand Dollars ($88,000.00); or (iii) the full lease amount (total payment to Gogul shall not to exceed $33,000 in addition to or above 50 percent of the lease in the event the 2025 lease is greater than the 2024 lease). The difference between (50%) of such lease fee and the amount received by Gogul will go towards repayment of the Stipulated Sum. (*By way of example, if the Horse should lease for the sum of $110,000, Gogul shall receive $88,000.00 and the Stipulated Sum will be reduced by $33,000. If the Horse should lease for $100,000, Gogul shall receive $88,000.00 and the Stipulated Sum will be reduced by $33,000. If the Horse should lease for $80,000, Gogul shall receive $80,000 with the Stipulated Sum reduced by $40,000.*)

ii.  If the Horse is leased between December 1, 2025, and November 30, 2026, Gogul shall be paid 50% of the lease fee plus the remaining amount due from the Stipulated Sum. (*By way of example, if the remaining balance of the Stipulated Sum is $22,000 and the Horse should lease for the sum of $110,000, Gogul shall receive $77,000.00 and the Stipulated Sum would be paid in full. If the remaining balance of the Stipulated Sum is $22,000 and the Horse should lease for $100,000, Gogul shall receive $77,000.00 and the Stipulated Sum would be paid in full. If the Horse should lease for $80,000 and the remaining balance of the Stipulated Sum is $22,000, Gogul shall receive $62,000 and the Stipulated Sum would be paid in full.*) If the lease fee is not



Initials      Initials

2



sufficient to pay down the Stipulated Sum, the balance will carry over to the next transaction that generates income from the horse.

b. If the Horse should be sold, Gogul shall receive fifty percent (50%) of the sales price plus an amount equal to the balance remaining of the Stipulated Sum. Fanelli shall receive the remaining amount of the sales price.

c. If there is a casualty event, as defined in the applicable insurance policy for the Horse, that triggers payment under the insurance policy, Gogul shall receive fifty percent (50%) of the insurance proceeds plus an amount equal to the balance remaining of the Stipulated Sum. Fanelli shall receive the remaining amount of the insurance proceeds.

d. Any such payments to Gogul shall be paid as directed by Gogul or his counsel at the time of the transaction. Any such payments to Fanelli shall be paid as directed by Fanelli or her counsel at the time of the transaction.

e. Nothing contained herein shall prevent Fanelli from prepaying the amount due on the Stipulated Sum. In the event the Horse cannot generate sufficient revenue to pay the Stipulated Sum by November 30, 2027, the balance due of the Stipulated Sum shall become due and payable as a judgment pursuant to the consent decree.

5.      **Consent of the Parties to Lease or Sale**. The Parties agree that the Horse shall not be sold, leased or otherwise hypothecated in any way without the consent both Fanelli and Gogul's consent to the price and terms of such transaction. The Parties agree that any lease shall contain the following terms: (a) Lessee shall reimburse lessors for medical and mortality insurance premiums and shall comply with all terms of the policy including any conditions precedent; (b) Reasonable approval of all boarding stables and trainer utilized by lessee; (c) Reasonable limits on height jumped by horses in shows and during practice. Reasonable limits on frequency of shows; (d) A waiver of liability; (e) Indemnification from third party claims and if Horse will be used by a minor, indemnification by parents or legal guardians; (f) Annual leases shall end on November 30th of the applicable year; and (g) Lessee shall be fully responsible for all care and maintenance of Horse.

6.      **Instructions to Third Parties**. Fanelli agrees that concurrently with execution of this Agreement, her counsel shall send, via certified mail and via email letters to Lori Puthoff, Carol Wilner, and Julie Winkle letters on counsel's letterhead advising them of this Agreement, of Gogul's co-ownership of the Horse and instructing them to provide Gogul with all veterinary records of the Horse, and the names of all veterinarians who have treated the Horse while in their possession. A copy of each such letter and proof of mailing shall be forwarded to counsel for Gogul within 24 hours after the letters are sent. The form of such letter is attached hereto as **Exhibit 3**.

7.      **Right of First Refusal**. The Parties further agree that any sale shall be subject to a right of first refusal described in the Co-Ownership Agreement.



Initials      Initials

3



sufficient to pay down the Stipulated Sum, the balance will carry over to the next transaction that generates income from the horse.

b. If the Horse should be sold, Gogul shall receive fifty percent (50%) of the sales price plus an amount equal to the balance remaining of the Stipulated Sum. Fanelli shall receive the remaining amount of the sales price.

c. If there is a casualty event, as defined in the applicable insurance policy for the Horse, that triggers payment under the insurance policy, Gogul shall receive fifty percent (50%) of the insurance proceeds plus an amount equal to the balance remaining of the Stipulated Sum. Fanelli shall receive the remaining amount of the insurance proceeds.

d. Any such payments to Gogul shall be paid as directed by Gogul or his counsel at the time of the transaction. Any such payments to Fanelli shall be paid as directed by Fanelli or her counsel at the time of the transaction.

e. Nothing contained herein shall prevent Fanelli from prepaying the amount due on the Stipulated Sum. In the event the Horse cannot generate sufficient revenue to pay the Stipulated Sum by November 30, 2027, the balance due of the Stipulated Sum shall become due and payable as a judgment pursuant to the consent decree.

5. **Consent of the Parties to Lease or Sale**. The Parties agree that the Horse shall not be sold, leased or otherwise hypothecated in any way without the consent both Fanelli and Gogul's consent to the price and terms of such transaction. The Parties agree that any lease shall contain the following terms: (a) Lessee shall reimburse lessors for medical and mortality insurance premiums and shall comply with all terms of the policy including any conditions precedent; (b) Reasonable approval of all boarding stables and trainer utilized by lessee; (c) Reasonable limits on height jumped by horses in shows and during practice. Reasonable limits on frequency of shows; (d) A waiver of liability; (e) Indemnification from third party claims and if Horse will be used by a minor, indemnification by parents or legal guardians; (f) Annual leases shall end on November 30th of the applicable year; and (g) Lessee shall be fully responsible for all care and maintenance of Horse.

6. **Instructions to Third Parties**. Fanelli agrees that concurrently with execution of this Agreement, her counsel shall send, via certified mail and via email letters to Lori Puthoff, Carol Wilner, and Julie Winkle letters on counsel's letterhead advising them of this Agreement, of Gogul's co-ownership of the Horse and instructing them to provide Gogul with all veterinary records of the Horse, and the names of all veterinarians who have treated the Horse while in their possession. A copy of each such letter and proof of mailing shall be forwarded to counsel for Gogul within 24 hours after the letters are sent. The form of such letter is attached hereto as **Exhibit 3**.

7. **Right of First Refusal**. The Parties further agree that any sale shall be subject to a right of first refusal described in the Co-Ownership Agreement.



Initials    Initials

3



8.  **Release of Claims.** Except for a breach or violation of the obligations created by this Agreement and the Co-Ownership Agreement and the Consent Decree, the Parties, with full understanding of the contents and legal effect of this Agreement, and mutual releases contained herein, promise to and do hereby completely release and forever discharge each other, as well as each Party's affiliates, predecessors, successors, assigns, partners, joint venturers, administrators, executives, owners, employees, shareholders, officers, directors, insurer, accountants, fiduciaries, representatives, family members, heirs, attorneys, and all other persons or entities claiming through them or on their behalf, from any and all claims of any and every kind, nature, and character, known or unknown, past, present, and future, arising from the Action.

9.  **California Civil Code Section 1542 Waiver.** Except as otherwise set forth in this Agreement, the Parties and each of them do hereby assume the above-mentioned risks and agree that this Agreement shall apply to all unknown or unanticipated results of the transactions and occurrences described above, as well as those known and anticipated, and upon advice of counsel, each party does hereby knowingly waive any and all rights and protections under Section 1542 of the California Civil Code which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Parties to this Agreement understand and expressly acknowledge the significance of Section 1542, and this Agreement shall act as a release of future claims against the Parties hereto, except where otherwise indicated in this Agreement and the provisions of Section 1542 are hereby waived.

10. **Assignment.** Each Party represents and warrants that they have full authority to enter into this Agreement and no portion of any claim, right, demand, or cause of action that said Party may now or hereafter have against another Party, arising from this Agreement has been assigned, granted, or transferred by that Party, whether voluntarily or involuntarily, to any other person, firm, or entity.

11. **Venue and Jurisdiction.** This Agreement shall be deemed to have been mutually negotiated, prepared, and entered into in California and shall be governed, construed and interpreted in accordance with the laws of the State of California. Enforcement of the Consent Decree shall be determined by the Court in the Action. In the event of any dispute, claim or controversy arising out of or relating to this Agreement that is outside the scope of the Consent Decree relating to or arising out of the breach, termination, enforcement, interpretation, construction, or validity thereof, the Parties hereby consent to binding arbitration as set forth in the Co-Ownership Agreement.



Initials    Initials

4



12.    **Representation by Counsel.** The Parties have had the opportunity to have this Agreement and any related documents, reviewed by an attorney of their choice. Accordingly, the language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties.

13.    **No Admission of Fault.** Except as expressly provided herein, each Party understands and agrees that this Agreement and the settlement provided herein are intended to compromise the Action, to avoid litigation and to buy peace, and that this Agreement and the settlement provided for herein shall not be construed or viewed as an admission by any of the Parties of liability or wrongdoing, such liability being expressly denied. This Agreement, and the settlement provided for herein shall not be admissible in any lawsuit, administrative claim or any judicial, administrative or arbitration proceeding if offered to show, demonstrate, evidence, or support a contention that any of the Parties acted illegally, improperly, or in breach of law, contract, or proper conduct.

14.    **Authority of Signing Individual or Party.** The Parties warrant, represent, and agree that each has the authority, capacity and is legally competent to enter into this Agreement and has the authority to bind each Party to the representations, terms, conditions, and covenants set forth herein. This Agreement shall be binding and is binding upon the Parties, their respective heirs, successors, assigns, parent and subsidiary companies, agents, attorneys, and representatives.

15.    **Attorneys' Fees.** In the event any action is brought to enforce any provision of this Agreement, the prevailing party shall be entitled, in addition to all other remedies, to collect its costs and expenses including reasonable attorneys' fees as part of its judgment.

16.    **Severability.** If any provision of this Agreement is for any reason held to be invalid or unenforceable under applicable laws, such invalidity shall not affect any of the provisions of this Agreement that can be given effect without the invalid provisions, and to this end, the provisions hereof are severable unless such invalidity would defeat the entire business purpose of this Agreement.

17.    **Voluntary Agreement.** The Parties, and each of them, hereby certify that this Agreement is being freely and voluntarily signed by each of them after each has: (i) read this Agreement; (ii) been apprised by their attorney of all relevant information and the consequences of signing this Agreement; and (iii) made their own respective investigation of the facts related to this Agreement. The Parties, and each of them, are relying solely on their own judgment, belief, and knowledge with regard to the subject of this Agreement, and they acknowledge that they have not been influenced to any extent whatsoever in making this Agreement by any representations, inducements, promises or other statements by any other party to this Agreement, or anyone else, which are not set forth herein.

18.    **Entire Agreement.** This Agreement along with all exhibits constitute the entire Agreement between the Parties on the subject matter involved herein. There are no oral agreements, which modify, vary, or contradict any provision of this Agreement, and there are no representations (oral or otherwise) which any party has relied on in agreeing to this Agreement



Initials    Initials

5



other than those expressly contained herein. This Agreement will not be modified or amended in any manner except upon a written agreement signed by each of the Parties.

19.     **Further Cooperation**. The Parties agree to cooperate in the preparation and execution of any and all documents that are reasonably necessary to carry out the purpose and intent of this Agreement. Neither Party shall unreasonably withhold, condition, or delay its compliance with any reasonable request made pursuant to this Agreement.

20.     **Counterparts**. This Agreement may be executed in counterparts. The signed counterparts shall collectively be considered a single document. A true and correct copy or facsimile of this Agreement shall be equally binding as an original signature.

21.     **Successors and Assigns**. This Agreement shall bind and inure to the benefit of the Parties and their respective heirs, successors, and assigns.

22.     **Waiver and Consent**. Any waiver of, or consent to depart from, the requirements of any provision of this Agreement shall be effective only if it is in writing and signed by the Party giving such waiver, and only in the specific instance and for the specific purpose for which it has been given. No waiver of any of the provisions of this Agreement shall constitute a continuing waiver or a waiver of any other provision (whether or not similar). No failure on the part of any Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of such right. No single or partial excuse of any such right shall preclude any other or further exercise of such right or exercise of any other right.

23.     **Notices**. All notices and other communications which are required to be, or which may be given under this Agreement shall be in writing and shall be delivered at the addresses set out hereinbelow. Notice may be given by personal delivery, recognized overnight courier, by United States certified mail. Notice shall be deemed to have been duly given (a) if by personal delivery, on the first to occur of the date of actual receipt or refusal of delivery by any person at the intended address, (b) if by overnight courier, on the first (2nd) Business Day after being delivered to a recognized overnight courier, or (c) if by certified mail, on the fifth (5th) Business Day after being deposited in the United States mail, certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Gogul:

> Adina T. Stern, Esq.
> Adina T. Stern, A Professional Law Corporation
> 30021 Tomas Street, Suite 300
> Rancho Santa Margarita, California 92688
> Email: astern@sternlawoffices.com
> Phone: (949) 459-2111


Initials      Initials



6

If to FANELLI:

> Christopher Norton, Esq.
> 1901 Avenue of the Stars, Suite 200
> Los Angeles, CA 90067
> Telephone: (424) 431-1990
> Direct Dial: (424) 431-4432
> Email: cnorton@smsm.com

24.    **Time of the Essence**. The Parties agree that time is of the essence throughout the term of this Agreement and any extension or renewal thereof, and of every provision hereof in which time is an element. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

25.    **Section Headings**. The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals as of the day and year first set forth above.

Date: _____

_____
Jeffrey Gogul

Date: **December 26 2024**

_Denya G Fanelli_
Denya Fanelli

**EXHIBIT 1**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| JEFFREY J. GOGUL,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DENYA FANELLI individually and doing business as CALI COAST EQUESTRIAN,<br><br>                    Defendant. | Case No. 2:23-cv-10690-HDV-RAO<br>(Assigned to Honorable Hernán D. Vera and Magistrate Judge, Honorable Rozella A. Oliver)<br><br>**CONSENT DECREE** |
| DENYA FANELLI individually and doing business as CALI COAST EQUESTRIAN,<br><br>                    Counter-Claimant,<br><br>          v.<br><br>JEFFREY J. GOGUL,<br><br>                    Counter-Defendant. | Complaint filed:  December 20, 2023<br>Trial Date:          May 6, 2025 |

The parties desire to avoid further litigation and have reached agreement, which is memorialized in **Exhibit 1** of this Consent Decree. Neither Defendant nor Counter-Defendant admits any liability or wrongdoing on their part and this Consent Decree shall not constitute any admission on their part of any liability or wrongdoing here. Certain portions of the agreement between the parties require further action and accordingly, they wish that the court retain jurisdiction over this matter for the purposes of enforcing certain portions of the agreement by and between the parties: Accordingly,

//

//

//

1

JOINT STIPULATION

It is ORDERED, ADJUDGED, AND DECREED as follows:

1. Defendant and Counter-Claimant, Denya Fanelli ("Fanelli"), shall immediately notify the United States Equestrian Federation that Plaintiff and Counter-Defendant, Jeffrey J. Gogul, ("Gogul") is a co-owner of that that Grey, Warmblood gelding by Cardento, out of Vanita, foaled in 2010 known as and registered with the United States Equestrian Federation ("USEF") as "The Funk Zone" (Horse No. 5723566) (the "Horse"). Accordingly, Ms. Fanelli is ordered to complete the USEF Ownership Transfer Form online adding as a co-owner Mr. Gogul as he is known by USEF: Jeff Gogul, USEF Member No. 118106. Ms. Fanelli shall be responsible for paying the fee for such a transfer. This task must be performed by Ms. Fanelli as the parties have been informed by USEF, that it does not provide for any other method of adding a co-owner.

2. Once the transfer is complete, Ms. Fanelli shall provide Mr. Gogul, through counsel, with a copy of all email confirmation from USEF of the transfer request and all email certificates she receives.

3. The parties are ordered to execute the Co-Ownership Agreement attached to the Settlement as its Exhibit 2.

4. Ms. Fanelli agrees that by no later than December 26, 2024 she shall notify Lori Puthoff, Carol Wilner, and Julie Winkle with a letter in the form attached hereto as Exhibit 3 advising these individuals to provide Mr. Gogul with all veterinary records of the Horse, and the names of all veterinarians who have treated the Horse while in their possession.

5. Within 24 hours after sending such letter, Ms. Fanelli shall provide Mr. Gogul, through counsel, with that the letters were sent.

6. This court shall retain jurisdiction over this matter for the purpose of enforcement of the agreement by and between the parties.

2

1   Dated:_____, 20__

2

3

4

5

       _____   _____

6   Honorable Hernán D. Vera
       Judge

7

8   Approved:

9

10

11   _____   _____

12   ADINA T. STERN,
       A PROFESSIONAL LAW CORPORATION

13   Adina T Stern
       Attorneys for Plaintiff/Counter-Defendant

14   Jeffrey J. Gogul

15

16

17   _____   _____

18   SEGAL McCAMBRIDGE
       SINGER & MAHONEY, LTD.

19   Christopher P. Norton
       David A. Carnie

20   Michael Cohen
       Attorney for Defendant/Counter-Claimant,

21   DENYA FANELLI individually
       and doing business as CALI COAST EQUESTRIAN

22

23

24

25

26

27

28

**EXHIBIT 2**

# EQUINE CO-OWNERSHIP AGREEMENT

This Equine Co-Ownership Agreement (the "**Agreement**") is being entered into as of December 16, 2024, by Jeffrey Gogul ("**Gogul**") and Denya Fanelli ("**Fanelli**"). Gogul and Fanelli shall be collectively referred to as the "Parties" or individually as a "Party."

## RECITALS

**WHEREAS** on or about February 24, 2021, Gogul and Fanelli jointly purchased the Grey, Warmblood gelding by Cardento, out of Vanita, foaled in 2010 known as and registered with the United States Equestrian Federation ("**USEF**") as "The Funk Zone" and also commonly known as "Rio" (Horse No. 5723566) (the "**Horse**").

**WHEREAS** the Parties entered into an oral agreement on or about February 24, 2021, and subsequently had disputes that resulted in litigation in that action entitled filed an action in the United States District Court, Central District of California, Western Division on December 20, 2023, entitled *Gogul v. Fanelli*, Case No. 2:23-cv-10690-HDV-RAO (the "**Action**").

**WHEREAS** the Horse was leased to Lori Puthoff ("**Puthoff**") during the calendar year 2023 (the "**2023 Lease**") and all payments for the 2023 Lease were retained by Fanelli. The Horse was re-leased to Puthoff pursuant to a renewal of the 2023 Lease (the "**2024 Renewal Lease**") and Fanelli retained those payments as well. The 2024 Renewal Lease will expire on December 31, 2024.

**WHEREAS** concurrent with this Agreement, the Parties are executing a Mutual General Release and Settlement Agreement (the "**Settlement Agreement**") and Consent Decree (the "**Consent Decree**") which resolves all claims relating to the Horse and the Action through and including the date of execution of this Agreement, and this Agreement is intended to govern the relationship between the Parties thereafter.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, mutual covenants contained in this Agreement and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Purpose of the Agreement**. To set forth the terms and conditions of the co-ownership of the Horse by Gogul and Fanelli. The purpose of this co-ownership is to lease or sell the Horse and maximize the Parties' investment in the Horse.

2. **Registration of the Horse.** Concurrent with execution of this Agreement, Fanelli shall complete the USEF Ownership Transfer Form online (initiated at https://members.usef.org/horses/transfer/select adding Jeff Gogul, USEF Member No. 118106 as owner of the Horse and shall pay the fee associated with such transfer. Fanelli shall provide Gogul, through counsel (identified in Section 20 of this Agreement) ("Gogul's Counsel"), with a copy of all email confirmations from USEF and any email certificate provided by USEF.

3. **Incorporation of Settlement Agreement**. The terms of the Settlement Agreement are incorporated herein by this reference. In the event of a conflict between the Settlement Agreement

_____   _____
Initials     Initials                                          1

and this Agreement, the Settlement Agreement shall prevail. Delay, or failure of the Court (in the Action) to execute the Consent Decree, shall not have an effect on this Agreement which shall be binding on the Parties from the date of execution of this Agreement, until terminated.

**4. Disclosures**. No information regarding the Horse shall be concealed by either Party from the other. Any information provided to a Party regarding the Horse (including, without limitation, information provided by any veterinarian, farrier or other practitioner who has examined the Horse, current or former lessees, potential purchasers, sales agents, riders, appraisers, horse show managers, USEF representatives, serious potential lessors or buyers, and/or any person or persons having material information regarding the Horse) shall be provided by the Party receiving the information to the other Party. The Parties shall disclose all commissions paid to or received by any individual arising from or relating to the lease or sale of the Horse. Nothing contained herein requires the disclosure of attorney/client privileged information, and nothing contained herein will prevent the Parties from communicating with one another through their respective counsel (as identified in Section 20 of this Agreement) if they choose not to communicate directly.

5. **Distribution of Income from the Horse**. The Parties agree that Fanelli owes Gogul the sum of Fifty-Five Thousand Dollars ($55,000.00) (the "**Stipulated Sum**") for profits held by Fanelli arising from the joint ownership of the Horse. Payment of the Stipulated Sum shall be made as set forth in Sections 5.1through 5.5 of this Agreement.

    5.1    **Payment of Stipulated Sum from Lease Proceeds**. The Parties agree that Gogul shall be paid the Stipulated Sum from all lease proceeds from the Horse as follows:

        5.1.1    If the Horse is leased for use at any time during the period commencing January 1, 2025, and ending November 30, 2025, Gogul shall be paid the greater of the following: (i) Eighty percent (80%) of the lease fee; or (ii) Eighty-Eight Thousand Dollars ($88,000.00) or (iii) the full lease amount (total payment to Gogul shall not to exceed $33,000 in addition to or above 50 percent of the lease in the event the 2025 lease is greater than the 2024 lease ). The difference between (50%) of such lease fee and the amount received by Gogul will go towards repayment of the Stipulated Sum.

        5.1.2    If the Horse is leased between December 1, 2025, and November 30, 2026, Gogul shall be paid 50% of the lease fee plus the remaining amount due from the Stipulated Sum. If the lease fee is not sufficient to pay down the Stipulated Sum, the balance will carry over to the next transaction that generates income from the Horse.

    5.2    **Payments of Stipulated Sum from Sales Proceeds**. If the Horse should be sold, Gogul shall receive fifty percent (50%) of the sales price plus an amount equal to the balance remaining of the Stipulated Sum.

    5.3    **Payment of the Stipulated Sum from Insurance Proceeds**. If there is a casualty event that triggers payment from insurance, as defined under the applicable insurance policy for the Horse, after payment of the Horse's expenses related to such casualty, Gogul shall receive fifty percent (50%) of the insurance proceeds plus an amount equal to the balance remaining of the Stipulated Sum. The remaining amount shall be retained by Fanelli.

5.4     **No Prepayment Penalty**. Nothing contained herein shall prevent Fanelli from prepaying the amount due on the Stipulated Sum.

5.5     **Payment of the Stipulated Sum Pursuant to Consent Decree**. In the event the Horse cannot generate sufficient revenue to completely pay off the Stipulated Sum by November 30, 2027, the remaining unpaid balance of the Stipulated Sum shall become due and payable as a judgment pursuant to the Consent Decree.

5.6     **Division of Profits After the Stipulated Sum is Repaid**. Once the Stipulated Sum is repaid to Gogul, the Parties shall divide the profits generated by the Horse equally after payment of costs and expenses as set forth in Section 12 of this Agreement.

## 6.   Warranties and Representations

6.1     **Fanelli Warranties and Representations**:

6.1.1     Fanelli warrants and represents that she has not transferred any right title or interest in the Horse to any other person or entity and the Horse is free of any liens (including agister's liens), encumbrances, and has all requisite rights and powers to enter into this Agreement.

6.1.2     Fanelli warrants and represents that except as specified in this section, to the best of her knowledge, the Horse is currently sound and in good physical condition, and Horse has no previous illnesses, lameness or other physical conditions that may affect his current or future performance. Exceptions are: none known.

6.1.3     Fanelli warrants and represents that to the best of her knowledge, the Horse does not exhibit any behavioral issues uncommon for a horse of Rio's age, experience, and temperament.

6.1.4     Fanelli warrants and represents that she has not entered into any lease agreement for the Horse for its use after December 31, 2024.

6.1.5     Fanelli warrants and represents that the Horse is currently insured with Great American Insurance Group pursuant to Policy No. _____.

6.2 **Gogul Warranties and Representations**:

6.2.1     Gogul warrants and represents that he has not transferred any right title or interest in the Horse to any other person or entity and the Horse is free of any liens (including agister's liens), encumbrances, and has all requisite rights and powers to enter into this Agreement.

_____   _____
Initials    Initials                                     3

6.2.2    Gogul has not had custody or control of the Horse or communications with Puthoff or anyone who trains the Horse and therefore is unable to make any warranties or representations relating to the Horse's current soundness and physical condition and is relying upon Fanelli to provide all such information.

6.2.3    Gogul has not had custody or control of the Horse or communications with Puthoff or anyone who trains the Horse and therefore is unable to make any warranties or representations relating to whether or not the Horse has any behavioral issues and is relying upon Fanelli to provide all such information.

6.2.4    Gogul warrants and represents that he has not entered into any lease agreement that will go into effect after the expiration of the 2024 Lease Renewal.

**7. Insurance.** The Parties agree that during the term of the Agreement, the following types of insurance shall be maintained for the Horse: (a) medical insurance; and (b) mortality insurance in an amount at least equal to whichever is less: (a) the Horse's fair market value, or (b) an amount such that the annual premium is no greater than Ten Thousand Dollars ($10,000.00). Upon execution of this Agreement, Fanelli shall provide Gogul with contact information for the agent handling the Horse's current insurance policy and Gogul shall be responsible for paying the Horse's insurance commencing January 1, 2025, and Fanelli shall reimburse Gogul for fifty (50%) percent of all costs and premiums related to such insurance that are not reimbursed by a lessee pursuant to Section 12 of this Agreement. In the event that a claim must be made under an applicable policy, the Parties agree to cooperate in good faith, including, but not limited to, timely obtaining all approvals that may be necessary or advisable from the insurance company, and providing all information and documentation requested by the insurance company.

8. **Indemnity.**

8.1    **Fanelli Indemnity.** Fanelli shall indemnify, defend, and hold Gogul harmless for any and all claims, actions or damages arising from or related to any and all acts of Fanelli related to the Horse, the Action, or the breach of her obligations under this Agreement or the Settlement Agreement.

8.2    **Gogul Indemnity.** Gogul shall indemnify, defend, and hold Fanelli harmless for any and all claims, actions or damages arising from or related to any and all acts of Gogul related to the Horse, the Action, or the breach of his obligations under this Agreement or the Settlement Agreement.

**9. Arbitration.** ANY PARTY HERETO MAY REQUIRE THE ARBITRATION OF ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED AGREEMENT. SUCH PARTY MAY INITIATE AND REQUIRE ARBITRATION BY GIVING NOTICE TO THE OTHER PARTY SPECIFYING THE MATTER TO BE ARBITRATED.

_____  _____
Initials    Initials                         4

IN THE EVENT OF ANY DISPUTE CONCERNING OR ARISING OUT OF THIS AGREEMENT (THAT IS NOT COVERED BY THE SUBJECT OF THE CONSENT DECREE), SUCH DISPUTE SHALL BE SUBMITTED BY THE PARTIES TO BINDING ARBITRATION. ARBITRATION PROCEEDINGS MAY BE COMMENCED BY EITHER PARTY GIVING THE OTHER PARTY WRITTEN NOTICE THEREOF AND PROCEEDING THEREAFTER IN ACCORDANCE WITH THE RULES AND PROCEDURES OF THE RELEVANT ARBITRATOR FOR EXPEDITED ARBITRATIONS SUCH THAT A DETERMINATION MAY BE MADE AS TO A PARTICULAR ISSUE WITHIN 60 DAYS. THE PARTIES AGREE TO SEND ARBITRATIONS THAT REQUIRE IMMEDIATE DETERMINATION AND A KNOWLEDGE OF EQUINE PRACTICE TO EITHER JUDGE JONATHAN H. CANNON (RET.) AT JAMS OR JUDGE LINDA S. MARKS (RET.) AT JUDICATE WEST OR FRANK T. BECKER, ESQ. OF EQUINE DISPUTE RESOLUTION IN LEXINGTON, KENTUCKY. ANY DISPUTE THAT DOES NOT REQUIRE IMMEDIATE RESOLUTION SHALL BE GOVERNED BY AND SUBJECT TO THE APPLICABLE LAWS OF THE STATE OF CALIFORNIA (INCLUDING THE DISCOVERY PROVISIONS OF THE CALIFORNIA CODE OF CIVIL PROCEDURE) AND THE PARTIES EACH CONSENT TO JURISDICTION BY THE ARBITRATOR OVER THEM. THE PARTIES SHALL SELECT AN ARBITRATOR THAT HAS A BACKGROUND IN EQUINE LAW AND SUCH ARBITRATION SHALL BE UNDER THE AUSPICES OF AN ARBITRATION ORGANIZATION (OTHER THAN THE AMERICAN ARBITRATION ASSOCIATION) THAT IS MUTUALLY AGREEABLE BY THE PARTIES. THE ARBITRATOR'S AWARD IN ANY SUCH ARBITRATION SHALL BE FINAL AND BINDING, AND A JUDGMENT UPON SUCH AWARD MAY BE ENFORCED BY ANY COURT OF COMPETENT JURISDICTION.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION.

Date: _____          _____
                                     Jeffrey Gogul


Date: _____          _____
                                     Denya Fanelli

**10. Consent as to Lease or Sale**. The Parties agree that the Horse shall not be sold, leased, or otherwise hypothecated in any way without the consent of both Fanelli and Gogul's consent to the price and terms of such transaction.

10.1    **Lease Terms**. The Parties agree that any lease shall contain the following terms: (a) Lessee shall reimburse lessors for medical and mortality insurance premiums and shall comply with all terms of the policy including any conditions precedent; (b) Reasonable approval of all boarding stables and trainer utilized by lessee; (c) Reasonable limits on height jumped by horses in shows and during practice. Reasonable limits on frequency of shows; (d)

A waiver of liability; (e) Indemnification from third party claims and if Horse will be used by a minor, indemnification by parents or legal guardians; (f) Annual leases shall end on November 30th of the applicable year; and (g) Lessee shall be fully responsible for all care and maintenance of Horse.

10.2    **Selection of Lessee**. If more than one potential lessee for the Horse is identified, the Parties, through counsel (as set forth in Section 20 of this Agreement), shall meet and confer to determine which lessee is more qualified, taking into account the following factors: (a) the lease price; (b) the reputation of the facility and trainer with whom the Horse will train; (c) the level and amount of work the Horse will perform under the new lease and its effect on the Horse's future value; (d) the skill and experience of the potential rider; and (e) the term of the lease. If the Parties cannot agree on which lessee to select, the Horse shall be placed with the lessee offering the highest lease fee for a minimum three-month period.

10.3    **Sale Terms**. If a Party receives a written offer to purchase the Horse, such Party will notify the other Party of the offer and its terms within 24 hours. If the offer is equal to or greater than Three Hundred Thousand Dollars ($300,000.00), the Parties shall accept the offer subject to the right of first refusal set forth in Section 11 ("Right of First Refusal"). Each Party shall execute all necessary transfer documents required for the sale of the Horse.

10.4    **Payment of Expenses**. Funds from the sale or lease of the Horse shall first be used to pay the Horse's expenses, including any commissions that may be owed in connection with the sale or lease of the Horse, then to pay the Stipulated Sum, if any part of it has not been paid, and then to each Party pro rata.

**11. Right of First Refusal**. Gogul grants to Fanelli the right, but not the obligation, to purchase the Horse on terms and conditions specified in any bona fide offer to purchase the Horse at fair market value or in excess of fair market value (the "Purchase Price"). If an offer is presented that is mutually acceptable to the Parties, acting in good faith, Fanelli shall have three (3) days to match the offer and purchase the Horse for an amount that is equal to fifty percent (50%) of the Purchase Price plus the balance of the Stipulated Sum still due plus any reimbursement due to Gogul. If Fanelli is in default for more than One Thousand Dollars ($1,000.00) under this Agreement, she will not be entitled to the Right of First Refusal. The Parties understand that they have a duty of good faith with respect to the sale of the Horse and Fanelli may not object to an offer if the Purchase Price is more than she can pay within the indicated time.

12. **Retirement.** The Parties agree that once the Horse turns 20 years of age, or before such time due to illnesses, lameness, or some other mental/physical condition (pursuant to the advice of a mutually agreed to veterinarian), the Horse  shall be retired following the conclusion of that year's lease, if any. The Parties further agree that upon the Horse's retirement, the Horse will retire to Fanelli's care and Gogul will be relieved of any obligations to pay for expenses or costs associated with the Horse, and Fanelli will not lease, sell, or attempt to profit from the Horse any time after the Horse's retirement. Once the Horse is retired, Gogul shall not retain any rights or interest in the Horse as described in this Agreement, the Settlement Agreement, or the Consent Decree.

**13.  Payment of Costs and Expenses**.

    **13.1**   **Reimbursement**. From time to time when expenses arise relating to the Horse, each Party agrees to pay their pro rata share of such expenses. If any Party is required to reimburse the other Party for expenses incurred pursuant to this Agreement, the reimbursing Party may require that the incurring Party provide valid receipts specifically itemizing such expenses. If the incurring Party is unable to provide the reimbursing Party with a receipt for a particular expense, the reimbursing Party is relieved of their obligation to pay such expense until such time as the incurring Party can provide a receipt or other proof of payment for the expense.

    **13.2**   **Expenses**. For purposes of this provision, acceptable expenses include mortality insurance, major medical insurance, medication and supplements, farrier care, veterinary care, transportation, board, feed, and marketing costs, sales commissions, competition costs, where the Horse is ridden by someone other than one of the Parties. Under no circumstances shall either Party be entitled to charge a training fee if the Horse is in their care.

    **14. Location of Horse**. If no new lessee for the Horse is determined prior to the expiration of the 2024 Renewal Lease, the Horse shall be transferred to a sales barn that is mutually acceptable to both Parties for marketing (the "**Accepted Sales Barn**"). The cost of the Accepted Sales Barn shall either be borne equally by the Parties or paid from the proceeds of any future lease or sale. The Accepted Sales Barn shall be made aware of the terms of this Co-Ownership Agreement and shall be required to cooperate with both Gogul's Counsel and counsel for Fanelli (as set forth in Section 20 of this Agreement ("**Fanelli's Counsel**"). The Accepted Sales Barn shall keep the Parties and their respective counsel apprised of any developments in the marketing and care of the Horse, and with respect to the terms of any future lease. During the term of this Agreement, if the Horse is not leased, the Horse shall be kept at a location that best facilitates the purpose of this Agreement as set forth in Section 1 and maximizes potential revenues and minimizes potential costs. If the Parties cannot mutually agree upon a sales agent for the Horse, the Horse shall be stabled at Gogul's training stable. In the event the Horse becomes permanently disabled prior to being sold, Fanelli shall take possession of the Horse and shall be responsible for all costs and expenses of the Horse's retirement.

    **15. Taxes**. Each Party shall be liable and shall pay all income taxes that may be due by reason of the lease or sale of the Horse. Any sales, use, or excise taxes, if applicable, shall be split evenly by the Parties.

    **16. Standard of Care**. While the Horse is in a Party's care, custody, and control, that Party shall use the highest level of care in caring for the Horse, including but not limited to providing a an environment commensurate with the Horse's value with respect to boarding, feed, veterinary care, hoof care, grooming and exercise. If the Horse requires emergency or other non-routine veterinary care, the Party in possession of the Horse shall notify the other Party immediately via

telephone and/or text. The Parties shall concur with one another regarding the administration of medications and supplements, farrier care, veterinary care, major maintenance costs, other care such as chiropractic, massage therapy or other non-routine veterinary care. All individuals who ride the horse shall do so with protective equipment including boots, gloves, and an ASTM/SEI certified equestrian helmet.

**17. No Assignments or Transfers**. No Party may sell, assign, pledge, mortgage or otherwise dispose of all or any portion of their ownership interests in the Horse or other rights pursuant to this Agreement without the consent of the other Party. However, in the event of the death of one Party, the other Party shall have the authority to make decisions with respect to the Horse but shall set aside the pro rata share of the surviving Party and immediately distribute what would be the deceased Party's share to the deceased Party's estate. In the event of incapacity of one Party (the "**Incapacitated Party**"), if an urgent decision must be made that is in the interests of both Parties and fulfills the purpose of this Agreement, the non-incapacitated Party shall have the power of attorney to act on behalf of the Incapacitated Party with respect to the urgent matter relating to the Horse.

**18. No Salaries or Draws.** Neither Party shall receive any salary for services rendered for the co-ownership. No interest shall be paid for advances made by one Party for authorized costs and expenses as set forth in Section 12, unless such advance is not reimbursed within sixty (60) days, after which the advance shall bear interest at ten percent (10%) per annum.

**19. Amendments and Modifications.** The Parties may amend this Agreement only by a written agreement executed by all Parties.

**20. Waiver**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**21. Notice**. Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given if: (a) personally delivered, (b) deposited in the United States mail, registered or certified, postage prepaid, addressed to the Parties' as set forth below, or (c) delivered by a recognized overnight mail carrier that provides proof of delivery. Until all obligations under this Agreement are completed, each Party shall have the duty to notify the other Parties immediately upon a change in contact information. If a Party does not provide the other Parties with notice of such changes, a notice delivered to the last contact information given under this Agreement shall be considered proper notice provided that the other conditions of this section have been met. Nothing contained herein, however, shall prevent the Parties from discussing matters amongst themselves if both Parties consent to communication in such manner; but final determinations and notices required by this Agreement must be made in writing as called for herein. Notices must be addressed to the Parties hereto at the following addresses, unless the addresses have been changed by notice in accordance with this Agreement:

If to Gogul:

_____   _____
Initials   Initials                              8

_____
_____
_____

With a copy to Gogul's Counsel:

Adina T. Stern, Esq.
Adina T. Stern, a Professional Law Corporation
30021 Tomas Street, Suite 300
Rancho Santa Margarita, CA 92679
(949) 459-2111
astern@sternlawoffices.com
info@sternlawoffices.com

If to Fanelli:

_____
_____
_____

With a copy to Fanelli's Counsel:

Christopher P. Norton, Esq.
Segal McCambridge Singer & Mahoney, Ltd.
1901 Avenue of the Stars, Suite 200
Los Angeles, CA 90067
(424) 431-1990
cnorton@smsm.com
mcohen@smsm.com
dcarnie@smsm.com

    **22. Assignment or Transfer.** No Party may assign or transfer this Agreement without the prior written consent of the other Parties.

    **23. Construction**. The language in all parts of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any of the Parties hereto. Whenever the context requires, any pronoun used in this Agreement shall include the corresponding masculine, feminine, and neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

    **24. Counterparts.** This Agreement may be executed in counterparts, and all counterparts so executed shall constitute one agreement, binding on all Parties hereto, notwithstanding that all of the Parties are not signatory to the original or the same counterpart. Documents that are electronically executed by DocuSign or similar technology shall be binding upon the Parties.

_____  _____
Initials    Initials

9

**25. Section Headings.** The captions of the Sections in this Agreement are for convenience only and in no way define, limit, extend or describe the scope or intent of any of the provisions hereof, shall not be deemed part of this Agreement and shall not be used in construing or interpreting this Agreement.

**26. Survival of Rights**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties hereto and their respective family members, administrators, trustees, executors, personal representatives, successors and permitted assigns.

**27. Entire Agreement.** This Agreement contains the entire agreement among the Parties. Any modifications or additions must be in writing and signed by all Parties to the Agreement. No oral modifications will be considered part of the Agreement unless reduced to writing and signed by all Parties.

**28. Additional Documents and Further Actions**. Each Party, upon the request of another Party, agrees to perform all further acts and execute, acknowledge and deliver all documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement, including but not limited to acknowledging before a notary public any signature heretofore or hereafter made by a Party.

**29. Time of the Essence**. Except as otherwise provided herein, time is of the essence in connection with each and every provision of this Agreement.

**30. Attorney's Fees and Other Expenses.** In any legal actions brought in connection with this Agreement, the prevailing Party(ies) will be entitled to prompt payment of expenses from the other Party(ies) following final adjudication in favor of the prevailing Party(ies). For the purpose of this section, "expenses" will include the following costs actually incurred by the prevailing Party(ies): attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements.

**31. Severability.** If any provision of this Agreement or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of this Agreement which can be given effect without the invalid provision or application. In lieu thereof there shall be added a provision as similar in terms to such illegal, invalid, and unenforceable provision as may be possible and be legal, valid, and enforceable.

**32. Advice of Counsel**. Each Party hereto represents that they have been afforded the opportunity to have an attorney of their choosing provide advice as to the effect of this Agreement and Release, has investigated the facts they deem necessary and are not relying upon any representations or acknowledgments, whether oral or in writing, of any other Party hereto, except as contained herein. Further, each Party acknowledges they have read this Agreement, the Settlement Agreement and the Consent Decree, and all exhibits thereto and understand their terms and are executing this agreement voluntarily and with full knowledge of each agreement's legal significance.

**BY SIGNING THIS AGREEMENT I CERTIFY THAT I HAVE READ THE FOREGOING AGREEMENT AND FULLY UNDERSTAND IT AND AGREE TO BE BOUND BY IT.**

Date: _____     _____
                            Jeffrey Gogul

Date: _____     _____
                            Denya Fanelli

**EXHIBIT 3**

DATE

VIA EMAIL AND CERTIFIED MAIL

NAME
ADDRESS
EMAIL

      Re:    <u>Gogul v. Fanelli</u>- USDC Case No. 2:23-vc-10690-HDV-RAO
              The Funk Zone- Horse No. 5723566

Dear_____:

      My office represents Denya Fanelli, the Defendant/Cross-Complainant in the above-entitled action which concerns the ownership of that grey, warmblood gelding by Cardento, out of Vanita, foaled in 2010 known as and registered with the United States Equestrian Federation ("USEF") as "the Funk Zone" (the "Horse").

      Please be advised that the Parties to this action, Ms. Fanelli and Jeffrey Gogul, have resolved their dispute in this matter and have entered into a Mutual General Release and Settlement Agreement and a Co-ownership Agreement. Pursuant to that Co-ownership agreement, both parties shall be joint legal owners of the Horse.

      Please allow this letter to serve as demand that you provide the following information to Mr. Gogul's counsel, Adina T. Stern, Adina T. Stern, a Professional Law Corporation, 30021 Tomas Street, Suite 300, Rancho Santa Margarita, CA92688; adina@sternlawoffices.com and info@sternlawoffices.com :

- Names and addresses of any and all veterinarians who have treated the Horse while in your possession.
- All veterinary records for any care/services rendered to the Horse while in your possession.

      Kindly provide this information to Ms. Stern's office within seven (7) days of receipt of this letter. Please feel free to contact my office with any questions or concerns. We appreciate your cooperation in this matter.